UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN KUZNOWICZ, | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 165 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| WRIGLEY SALES COMPANY, LLC, and | ) | |
| PRUDENTIAL INSURANCE COMPANY OF | ) | |
| AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

John Kuznowicz filed this lawsuit under § 502(a)(1)(B) of the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover short-term and

long-term disability benefits under a plan that his former employer, Defendant Wrigley Sales

Company, LLC, established through Defendant Prudential Insurance Company of America. The

case initially was assigned to Judge Hibbler's calendar, and then was reassigned to the

undersigned judge's calendar. Doc. 23. The parties agreed to submit this matter for a bench trial

on the written record under Federal Rule of Civil Procedure 52(a), with both sides filing

proposed findings of fact and conclusions of law. *See Migliorisi v. Walgreens Disability

Benefits Plan*, 2008 WL 904883, at *1 (N.D. Ill. Mar. 31, 2008) (utilizing this procedure in a

§ 1132(a)(1)(B) case); *LaBarge v. Life Ins. Co. of N. Am.*, 2001 WL 109527, at *1 (N.D. Ill. Feb.

6, 2001) (same).

Kuznowicz correctly notes that Defendants failed to comply with the Guidelines for

Proposed Findings of Fact and Conclusions of Law set forth as an appendix to the Local Rules of

this District, which require the defendant to respond directly to each factual statement and legal

contention set forth in the plaintiff's proposed findings of fact and conclusions of law. Doc. 22 at 1-2. Kuznowicz proceeds to argue that, as a result of Defendants' non-compliance with the Guidelines, the court should deem admitted all of the factual statements in his proposed findings of fact and conclusions of law. *Id*. at 2. The court declines to take that step. Unlike Local Rule 56.1(b)(3)(C), which provides that a party's factual assertions "will be deemed to be admitted" if the opposing party fails to rebut those assertions in a manner that complies with Local Rule 56.1(b)(3)(B), the Guidelines provide for no such sanction. The only remedy that appears to have been imposed for failure to comply with the Guidelines is a requirement that the offending party re-submit its proposed findings and conclusions. *See*, *e.g.*, *Springs v. Runyon*, 1995 WL 221832, at *2-3 (N.D. Ill. Apr. 11, 1995); *Folkstone Mar., Ltd. v. CSX Corp.*, 1993 WL 96479, at *4 (N.D. Ill. Mar. 29, 1993). The court did not impose that remedy because the parties' submissions allowed the court to resolve their material factual disputes.

Having carefully reviewed the written record, the court enters the following findings of fact, which are found by a preponderance of the evidence, and conclusions of law. To the extent that any findings of fact may be considered conclusions of law, they shall be deemed conclusions of law, and vice versa. The result is judgment in favor of Defendants.

### Findings of Fact

####    A.    The Parties

1.    John Kuznowicz is a man in his mid-40s and has lived at all times in Rockford, Illinois. Doc. 19 at 2.

2.    Kuznowicz was employed by Wrigley as Territory Sales Manager from December 14, 1998, through November 16, 2009. *Ibid*.; Doc. 21-6 at 87. In this position,

Kuznowicz had to drive a vehicle, set up displays, lift items up to 55 pounds, and interact with customers and store personnel.  Doc. 19-2 at 1.

3.    As a Wrigley employee, Kuznowicz was covered under the Wrigley Disability Income Benefit ("Plan"), which provides both short-term and long-term benefits administered by Prudential.  Doc. 19 at 2.

**B.    Short-Term Disability Coverage Under the Plan**

4.    Wrigley's Short-Term Disability Coverage ("STD") provides weekly benefits to participants with a disability.  Doc. 21-11 at 17.

5.    The Plan provides in relevant part: "You are disabled when Prudential determines that: you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and you have a 20% or more loss in weekly earnings due to the same sickness or injury. … ***Material and substantial duties*** means duties that: are normally required for the performance of your regular occupation and cannot be reasonably omitted or modified. … ***Sickness*** means any disorder of your body or mind, but not an injury. … Disability must begin while you are covered under the plan." *Id*. at 16.

6.    The Plan further provides: "[Prudential] will stop sending you payments and your claim will end on the earliest of the following: 1. When you are able to work in your regular occupation on a ***part-time basis*** but you choose not to.  2. The end of the maximum period of payment.  3. The date you are no longer disabled under the terms of the plan.  4. The date you fail to submit proof of continuing disability satisfactory to Prudential.  5. The date your disability earnings exceed the amount allowable under the plan.  6. The date you die." *Id*. at 22.

7.    STD benefits can be paid for up to fifty-two weeks.  *Ibid*.

### C. Long-Term Disability Benefits Under the Plan

8.      Long-Term Disability Coverage ("LTD") benefits begin once the claimant's disability extends beyond 52 weeks.  Doc. 1-1 at 10.  "There are no additional applications or forms to complete" to transition from STD to LTD coverage.  *Ibid*.

9.      The definition of "disability" for purposes of LTD benefits is in all relevant respects the same as for STD benefits.  *Id*. at 28.

10.      The grounds for terminating LTD benefits are largely the same as under the STD.  The LTD has two additional contingencies.  The first is that after twelve months, LTD payments can end "when you are able to work in *any gainful occupation* on a part-time basis but you choose not to."  *Id*. at 36 (emphasis added); *see also id*. at 28.  "***Gainful occupation*** means an occupation, including self-employment, that is or can be expected to provide you with an income equal to at least 60% of your indexed monthly earnings within 12 months of your return to work."  *Id*. at 28.  The second is that payments can end on the "date you decline to participate in a rehabilitation program that Prudential considers appropriate for your situation and that is approved by your doctor."  *Id*. at 37.

11.      Certain types of disabilities have a limited pay period, including those that "are due in whole or part to ***mental illness,***" for which a claimant can receive up to twelve months of payments in a lifetime.  *Id*. at 37.  "Mental illness includes but is not limited to … anxiety, … and/or adjustment disorders or other conditions."  *Id*. at 38.

### D. Kuznowicz's Car Accident and the Approval of STD Benefits

12.      Kuznowicz stopped working after a car accident on November 15, 2009.  Doc. 21-6 at 77.  Kuznowicz contends in this court that the accident was caused by his "symptoms associated with vertigo, ear aches, severe migraine headaches, chronic imbalance, and persistent

episodes of lightheadedness, as well as hearing and vision limitations; in addition to the side effects of his prescribed medications." Doc. 19 at 4. In support, he cites only his December 2009 disability benefits claim. *Ibid*. (citing Doc. 21-6 at 77, 79-80, 82, 86). Based on the evidence set forth immediately below, the court finds that the accident was caused not by Kunowicz's alleged ailments, but by his drunk driving.

13. On November 16, 2009, Kuznowicz was charged with driving under the influence of alcohol ("DUI") in connection with the accident. Doc. 21-13 at 4-5. A state court docket entry dated December 21, 2009, states "stat summry suspensn." *Id*. at 3. This refers to the "statutory summary suspension" provision of the Illinois Vehicle Code, which requires drivers in Illinois to submit to a blood alcohol test when cited for driving under the influence and allows for a license suspension if a driver refuses to submit to such a test or if the driver's blood alcohol level is 0.08 or higher. *See* 625 ILCS 5/6-208.1; 625 ILCS 5/11-501.1.

14. On October 19, 2010, Kuznowicz pleaded guilty to the DUI charge. Doc. 21-13 at 1. No conviction appears to have been entered; the court order provided that if Kuznowicz complied with his terms of supervised release, which included paying a fine, the charges would be dismissed on April 12, 2012, without an adjudication of guilt. *Id*. at 8.

15. On December 21, 2009, Kuznowicz applied for STD benefits from Prudential. Doc. 21-6 at 74-88.

16. Kuznowicz supported his application with a certificate from his primary care physician, Dr. Theodore Schock, whom he first saw on November 17, 2009, two days after the accident. *Id*. at 79-81. Dr. Schock indicated that "significant loss of function occurred" on November 15, 2009, *id*. at 80, and his primary diagnosis was post-traumatic stress disorder ("PTSD"), with secondary diagnoses of vertigo and anxiety, *id*. at 79. Dr. Schock described the

-5-

nature of Kuznowicz's impairment as "panic attacks, agoraphobia, vertigo." *Ibid*. Dr. Schock indicated that Kuznowicz's medical restrictions prevented him from "driving, setting up displays, interacting with the public, making sales." *Ibid*. Dr. Shock's prognosis was that Kuznowicz would require several months off of work, with a target date of March 1, 2010, for returning. *Ibid*. In Dr. Schock's opinion, Kuznowicz's functional abilities allowed him to lift heavy weight, which means 25-50 pounds frequently or 50-100 pounds occasionally. *Id*. at 81. This was the lifting requirement for Kuznowicz's job. *Id*. at 85.

17. On December 23, 2009, Prudential granted Kuznowicz STD benefits. Doc. 21-7 at 54. The first date of disability was deemed to be November 15, 2009. *Ibid*. Due to a one-month elimination period, Prudential started paying benefits as of December 14, 2009, and benefits were to be paid through December 21, 2009. *Ibid*. Prudential did not specify why it granted the application for STD benefits. *Id*. at 54-55.

18. Prudential extended STD benefits twice, through January 10, 2010, and then through March 1, 2010. *Id*. at 42, 52. Both times, Prudential requested that Kuznowicz's physicians send diagnostic tests, office visit notes and charts, current restrictions and limitations, and an expected return to work date in the event Kuznowicz could not return on the target date. *Ibid*. Prudential also noted that " a doctor's 'excuse from work' note [was] insufficient to extend benefits." *Ibid*. Prudential did not specify the reason for extending benefits. *Ibid*.

### E.    The Termination of STD Benefits and Denial of LTD Benefits

19. On March 16, 2010, Joseph Gilliam, R.N., a Prudential claims manager, reviewed the documentation supporting Kuznowicz's claim. Doc. 21-6 at 94. Based on the reports of several physicians, which are described below, Gilliam determined that there was "no documentation of any severity of symptoms, abnormal testing results, or exam findings, or any

loss of physical or cognitive function that would prevent [Kuznowicz] from being able to [return to work] as of 3/1/10." *Id*. at 96. As a result, Prudential terminated his STD benefits on March 18, 2010, retroactively effective March 2, 2010. *Id*. at 97, 104; Doc. 21-7 at 32.

20. On September 15, 2010, Kuznowicz appealed the denial of his STD benefits, and at the same time asserted a claim for LTD benefits. Doc. 21-4 at 39-43. His appeal and request for LTD benefits were denied on November 3, 2010. Doc. 21-6 at 104-105.

**F. Medical Treatment Before Kuznowicz's Appeal of the Termination of STD Benefits and of the Denial of LTD Benefits**

21. The day of the car accident, November 15, 2009, Kuznowicz was admitted to Saint Anthony Medical Center and examined in the emergency room by Dr. Michael A. Marck. Doc. 21-3 at 45-46. Kuznowicz refused numerous tests, including "legal ETOH (ethanol alcohol)," and was belligerent and uncooperative. *Id*. at 45. Dr. Marck described Kuznowicz as "[not] a terribly reliable historian." *Ibid*. Kuznowicz complained of "some mild pain in his upper back and slightly in his neck. He denie[d] any headache." *Ibid*. Dr. Marck's notes reflect a diagnosis of "Motor vehicle accident, possible cervical and thoracic strain with belligerent behavior." *Id*. at 46.

22. The Fire Department's report indicated that Kuznowicz told the technicians who transported him from the scene of the accident to the hospital that he "drank 3 jagermeister shots" that night. Doc. 21-3 at 40. The court takes judicial notice that Jägermeister is a German liqueur that contains 35% alcohol. *See* http://en.wikipedia.org/wiki/J%C3%A4germeister (last visited July 31, 2013).

23. Kuznowicz also told the Fire Department's emergency medical technician that he had no "medical history, medications, or allergies." Doc. 21-3 at 40. However, Kuznowicz's

medical records reveals a history of anxiety and panic attacks dating back to 1988. Doc. 21-2 at 12, 151. The records also reflect that he was taking the anti-anxiety medications Alprazolam and Xanax at the time. Doc. 21-6 at 1. Kuznowicz was released at 10:30 p.m. to the custody of the Rockford Police Department. Doc. 21-3 at 46.

24.     Since the accident, Kunzowicz has been under the care of Dr. Schock, who referred him to numerous specialists, including an ear, nose, and throat doctor ("ENT"), an audiologist, a neurologist, two psychiatrists, and two physicians at specialized clinics. Kuznowicz has consistently reported balance problems, dizziness, nausea, panic attacks, headaches, hearing loss, and vision problems, but there has been no consensus on the cause or severity of his claimed symptoms.

### 1.     Primary Care Physician

25.     When he first went to see Dr. Schock, Kuznowicz complained that "he ha[d] not been as oriented and ha[d] been dizzy since accident" because of the air bag. Doc. 21-6 at 1. His "wors[t] complaint [was] throat irritation from air bag." *Ibid*. Kuznowicz explained that "in the ER he was refused treatment. … [H]e had trouble talking due to air bag contents. … [H]e refused [intravenous] due to fear of needles." *Ibid*. Dr. Schock's notes list Kuznowicz's medical conditions as whip lash, anxiety "in OT condition," chronic malaise and fatigue, thrush, and hypersomnia. *Ibid*. Dr. Schock referred Kuznowicz to "sleep medicine for evaluation" and told him to "continue to stay off work for now due to mental cloudyness." Doc. 19-6 at 1. Dr. Schock continued Kuznowicz on his anti-anxiety medication. *Ibid*.

26.     In monthly visits between December 2009 and July 2010, Kuznowicz complained to Dr. Schock of ringing in his ears, headaches, sleeping problems, vertigo, memory deterioration, loss of feeling in fingers on his left hand, occasional pain in the left elbow and

shoulder, and trouble getting out of bed because of balance. Doc. 21-2 at 18; Doc. 21-5 at 6, 8-9, 11-12; Doc. 21-6 at 3-4. By February 9, 2010, Kuznowicz reported to Dr. Schock that he had fallen three times in two weeks and that the pain and ringing in his ears kept him from sleeping. Doc. 21-5 at 131. The frequency of falls remained about the same for the rest of Kuznowicz's visits to Dr. Schock. Doc. 21-4 at 57; Doc. 21-5 at 2, 5.

27.     On December 1, 2009, the second visit, Dr. Schock assessed Kuznowicz with continuing anxiety, malaise, and fatigue, adding "tinnitus unspecified" and neck pain. Doc. 21-6 at 3; *see* Tinnitus, Medline Plus, *available at* http://www.nlm.nih.gov/medlineplus/ency/article/003043.htm (last visited July 31, 2013) ("Tinnitus is the medical term for 'hearing' noises in your ears when there is no outside source of the sounds."). Dr. Schock referred Kuznowicz to an ENT for tinnitus, and told him that he should not work until he was seen by the ENT; Dr. Shock also "prefer[red]" that he not "driv[e] for now." Doc. 21-6 at 3.

28.     Kuznowicz returned to see Dr. Schock on December 21, 2009, who listed his conditions as tinnitus, anxiety, vertigo, and PTSD. *Id*. at 4.

29.     On February 9, 2010, Dr. Schock listed the same conditions, but noted that the ENT had "told [Kuznowicz] he [was] bringing it on himself." Doc. 21-5 at 8.

30.     On March 1, 2010, Dr. Schock reported that Kuznowicz "continue[d] to have symptoms of vertigo," which he believed were "80-90% due to [PTSD]. Whether this is due to the [m]otor vehicle accident itself or due to the work and legal t[rou]bles associated with is hard to tell. None the less [sic] I do not feel he is safe to drive at this point or is able to set up displays or do sales presentations for the next 2 months." *Id*. at 6. Dr. Schock's assessment was that Kuznowicz "continue[d] to be disabled due to vertigo and [PTSD]." *Id*. at 147.

31.     On May 3, 2010, Dr. Schock noticed a new symptom: Plaintiff had a mildly ataxic gait, which is an unsteady, uncoordinated walk.  *Id*. at 5.

32.     On July 13, 2010, Dr. Schock reviewed the specialists' reports and assessed Kuznowicz with a disorder of labyrinth, unilateral conductive hearing loss, tinnitus, vertigo, and Ménière's disease.  Doc. 21-2 at 18.  Ménière's disease is an inner ear disorder that affects balance and hearing and that causes severe nausea, vomiting, sweating, vertigo or dizziness, hearing loss, diarrhea, headaches, abdominal pain or discomfort, and uncontrollable eye movements.  *See* Ménière's Disease, A.D.A.M. Medical Encyclopedia, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001721/ (last visited July 31, 2013).  Dr. Schock again ordered that Kuznowicz not drive or work.  Doc. 21-2 at 18.

### 2.     ENT and Audiologist

33.     On Dr. Schock's referral, Kuznowicz began to see Dr. Kianoush Sheykholeslami, an ENT.  At the first visit on December 9, 2009, Kuznowicz complained of ringing in his ears, hearing deterioration (mostly in his left ear), balance problems, dizziness, headache, and confusion.  Doc. 21-3 at 30.  His exam was "normal," and Dr. Sheykholeslami sent him for hearing tests and tests of the vestibular system, which controls balance and other neurological functions.  *Id*. at 30-31.

34.     On December 16, 2009, Kuznowicz visited a Doctor of Audiology, Dr. Michele Jones, to perform the tests recommended by Dr. Sheykholeslami.  Doc. 21-3 at 26-27.  Kuznowicz reported that his dizziness first began several years ago but had gotten worse and more frequent, making him feel dizzy "most all the time."  *Id*. at 20.  Kuznowicz also reported that since the car accident in November 2009, the ringing in both ears had worsened, he had more difficulty hearing, and he had started to withdraw from social activities.  *Id*. at 26.

35.     Dr. Jones determined that Kuznowicz had abnormal results from a vestibular evoked myogenic potential ("VEMP") study in his right ear that "should be interpreted as pathological." *Id*. at 27. She also conducted an audiological study, and found that Kuznowicz had a mild conductive loss at 250 Hz in his left ear; the other tests, including a dynamic visual acuity ("DVA") test, were otherwise normal. *Id*. at 26. Dr. Jones concluded: "Due to the patient's reports of dizziness following hyperventilation testing, the patient's symptoms are at minimum being exacerbated by his anxiety, if not being a major contributing factor to his symptoms." *Id*. at 27.

36.     On December 18, 2009, Dr. Sheykholeslami reviewed the results of Dr. Jones's tests. *Id*. at 83. Dr. Sheykholeslami's assessment was that "the patient is having a psychosomatic disorder more than a structural one. I think the patient is suffering from hyperventilation-induced dizziness due to the panic attacks." *Ibid*. Dr. Sheykholeslami's plan was to prescribe Valium and to talk to Dr. Schock about referring Kuznowicz to psychotherapy and balance rehabilitation. *Ibid*. On February 9, 2010, Kuznowicz told Dr. Schock that he was attending rehabilitation but that it was not helping him. Doc. 21-5 at 8.

37.     On April 5, 2010, during another examination by Dr. Sheykholeslami, Kuznowicz complained of dizziness leading to falls, panic attacks, headaches, earaches, and an inability to appear in public. Doc. 21-3 at 84. Dr. Sheykholeslami's assessment was psychosomatic panic disorder and possible Ménière's diseases. *Ibid*. Although Kuznowicz had started rehabilitation, he reported that he had stopped the exercises because they increased his falling. *Ibid*. On May 26, 2010, Kuznowicz returned to Dr. Sheykholeslami with similar complaints, and Dr. Sheykholeslami again noted the possibility of Ménière's disease. Doc. 21-3 at 85.

38.     On June 28, 2010, Dr. Sheykholeslami conducted several additional vestibular examination tests, and concluded that the "Vestibular exam [was] normal."  Doc. 21-2 at 14.

39.     In a June 29, 2010 audiological evaluation by Dr. Jones, Kuznowicz reported that his hearing had decreased in the right ear since the last evaluation.  *Id*. at 16.  Test results showed Kuznowicz had a mild sensorineural hearing loss in the right ear and a mild sensorineural loss nearing to normal hearing sensitivity in the left ear.  *Ibid*.

### 3.     Sleep Laboratory Consultation

40.     Dr. Theodore Ingrassia completed a sleep laboratory consultation on February 16, 2010, and made the following assessment: "anxiety disorder exacerbated by the patient's recent accident and tinnitus" and possible "sleep apnea."  Doc. 21-4 at 36.  Dr. Ingrassia recommended that Kuznowicz quit smoking, remove alcohol from his diet, and undergo additional testing for diagnostic purposes.  Doc. 21-4 at 37.

41.     For Kuznowicz's balance problems, Dr. Ingrassia's treatment plan included cognitive behavioral therapy to manage his insomnia.  *Ibid*.

### 4.     Balance Performance Evaluation

42.     On February 22 and 24, 2010, at OSF Rehabilitation Services, Kuznowicz underwent a balance performance evaluation that included computerized dynamic posturography ("CDP").   Doc. 21-5 at 132.  While most of the results from that evaluation were normal, abnormalities were noted on a DVA test, which "quantifies losses in visual acuity during head movement in different directions."  *Id*. at 133.  Kuznowicz's performance on the DVA test was "inadequate for normal functional ability."  *Ibid*.  Although the one abnormality was noted on the CDP, Kuznowicz was within normal limits on the composite CDP scores.  *Id*. at 132.

## 5. Psychiatric Evaluations

43. Kuznowicz saw two psychiatrists, Dr. David Wight and Dr. Martin Fields. Both ruled out possible PTSD and any other psychiatric disorders.

44. On April 22, 2010, Dr. Wight told Dr. Schock that Kuznowicz did not suffer from PTSD, which had been Dr. Schock's initial primary diagnosis. *Id*. at 15. Dr. Wight concluded that "from a psychiatric standpoint, [Kuznowicz] does have some situational adjustment from stressors … and has a history of Social Anxiety and past panic, but does not presently present with Panic Disorder nor PTSD, and his mood changes do not rise to the level of Major Depression nor certainly to the level of any Bipolar or psychotic phenomenon." *Id*. at 16. Dr. Wight also found that "the manifestations of vestibular issues are not closely related to acute changes in his mood nor is there any tight relationship to any acute anxiety/panic exacerbation." *Id*. at 15. Dr. Wight added: "Hopefully, in working with neurology and his ENT, the condition that he describes might be alleviated, medically." *Id*. at 16. Dr. Wight also suggested that Kuznowicz engage in psychotherapy with a therapist, but Kuznowicz was not "willing to make a definite commitment to this." *Ibid*.

45. On September 3, 2010, Kuznowicz was examined by Dr. Fields. Doc. 21-4 at 44. Dr. Fields concluded that Kuznowicz suffered not from PTSD, but from "mild depression secondary to medical condition." *Id*. at 45. Dr. Fields ruled out "psychiatric disorders" because Kuznowicz was "very meticulous and coherent in his explanation of things." *Id*. at 45. "I believe that the patient needs lifestyle rehabilitation treatment to help him to cope with a rather dramatic change in his lifestyle caused by the medical condition. That is, he has a very strong obsessive, compulsive personality with very strong goal orientation. He was quite successful at his profession, and this appeared to have been taken from him by the above mentioned

[vestibular] condition.  He needs to learn to adjust, and this physician will work with him on that, but without any additional psychotropic medication.  He does not have panic, nor does [he] have specific depression symptoms themselves." *Id.* at 44.  Dr. Fields rated Kuznowicz's level of function as between thirty and forty on a 100-point Global Assessment of Functioning scale. *Id.* at 45.  This rating can correspond either to some impairment in communication (illogical, obscure, or irrelevant speech) or to major impairment in several areas, such as work or mood. *See* Global Assessment of Functioning, *available at* http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning (last accessed July 31, 2013); *Harris v. Astrue*, 2012 WL 5930597, at *2 n.3 (N.D. Ind. Nov. 26, 2012) ("A GAF score of 31 to 40 reflects some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, avoids friends, neglects family, and is unable to work).").

### 6.    Neurology Consultations

46.    On February 19, 2010, Dr. Javaid Iqbal, a neurologist, examined Kuznowicz and concluded that he most probably suffered from "chronic vestibular disturbance leading to chronic mild vertigo on changing head positions.  No focal neurologic deficits present."  Doc. 21-2 at 12.   Dr. Iqbal ordered a magnetic resonance imaging ("MRI") scan of Kuznowicz's brain, which showed a slight degree of fluid in some areas, *id.* at 11, but no "significant abnormalities," Doc. 21-3 at 55.

47.    On June 10, 2010, Kuznowicz complained to Dr. Iqbal of episodes of vertigo without any warnings, falling down, feeling of fullness in both ears along with a mild degree of

hearing loss, and constant tinnitus. *Ibid.* Dr. Iqbal noted that Kuznowicz's underlying anxiety was "well controlled with the use of Kolonopin." *Id.* at 56.

## 7.     Northwestern Balance and Dizziness Clinic

48.     On July 14, 2010, Kuznowicz was examined by Dr. Timothy Hain, a specialist in dizziness and balance disorders at Northwestern University, who also conducted a complete review of Kuznowicz's medical history. Doc. 21-5 at 18-22.

49.     Dr. Hain concluded that a diagnosis of Ménière's disease was "dubious." *Id.* at 18. He came to this conclusion by reviewing the results of prior tests and by conducting his own tests. *Id.* at 18-22. Two previous tests performed to measure brain activity, an electrocorticography ("EcoG") test and an MRI, had produced normal results, and Dr. Hain did not repeat them. *Id.* at 20-22.

50.     Dr. Hain reviewed the results of audiograms, tympanometry, and VEMP testing, all conducted by Dr. Jones, as well as the results of an electronystagmogram test ("ENG"), which measures eye movement. *Id.* at 20-21. The ENG had produced normal results, though it was conducted on unfavorable equipment, and Dr. Hain did not conduct another such test. *Id.* at 21. Dr. Hain performed a VEMP test because he was skeptical of the "pathological" results from Dr. Jones's December 2009 VEMP study—he could not "get any useful information from" Dr. Jones's study due to a technical problem with the testing procedure. *Id.* at 20. Dr. Hain's VEMP test produced normal results. *Id.* at 21. Dr. Hain also conducted his own tympanometry, which was normal, as was the tympanometry conducted by Dr. Jones; his own high frequency audiometry, which showed reasonably good hearing; and his own otoacoustic emission ("OAE") testing, which produced good OAEs in both ears. *Id.* at 20-21. Based on his review of the audiograms conducted by Dr Jones, Dr. Hain concluded that there had to be a mistake in

-15-

reporting in one and an internal inconsistency in another. *Id*. at 20. It does not appear that Dr.

Hain reviewed the balance evaluation conducted by OSF Rehabilitation Services. *Id*. at 20-21.

51. Based on Kuznowicz's self-reporting, Dr. Hain found him to have poor balance with many falls to the right side, spinning spells and tilting sensations, frequent nausea, occasional vomiting, blurred vision, lightheadedness, headaches with bilateral ear pain that could be considered migraines, tinnitus, fullness in the ears, and hearing loss. *Id*. at 19. Dr. Hain also noted that Kuznowicz had attacks anywhere from three to four times a week, lasting between thirty minutes and more than three hours. *Ibid*. Events that triggered Kuznowicz's symptoms included head motion, walking in the dark, driving in a motor vehicle, loud noises, coughing, sneezing, straining, complicated visual environments, and exercise. *Ibid*. Dr. Hain suggested that many of the factors that typically trigger migraines did not trigger Kuznowicz's symptoms, making it less likely migraines were the cause. *Ibid*.

52. Dr. Hain's impression was that Kuznowicz suffered from ataxia (lack of voluntary coordination of muscles) with numerous falls; rebound nystagmus (involuntary eye movement); migraine headaches; and questionable Ménière's disease. *Id*. at 18. Dr. Hain concluded: "My treatment plan suggestion would be to exhaust medical management. Although I am dubious you have Ménière's, I see no harm in having you take … Ménière's medication. I also suggested that you change over to a migraine protocol if the betahistine [for Ménière's] fails." *Ibid*.

### G.  Medical Treatment After Kuznowicz's Appeal of the Termination of STD Benefits and of the Denial of LTD Benefits

53. After Kuznowicz appealed the termination of STD benefits and the denial of LTD benefits, he continued to see several physicians.

54.     Kuznowicz returned to Dr. Sheykholeslami, the ENT, on November 2, November 10, and December 22, 2010.  Doc. 19-3.  Dr. Sheykholeslami reported that Kuznowicz continued to have a "complex dysequilibrium problem" that was unresponsive to the medications prescribed.  *Id*. at 5-6.

55.     On November 2, 2010 and December 22, 2010, Dr. Jones, the audiologist, conducted additional hearing tests and reported "moderately severe rising to moderate sloping to moderately severe sensorineural loss bilaterally."  Doc. 19-7 at 3.  She concluded that, because two of her test results that day were inconsistent, "some amount of non-organic [meaning of an unknown cause] hearing loss versus possible psychological hearing loss [was] suspected at [that] time."  *Ibid*.

56.     On October 6, 2010, at an examination by Dr. Schock, the primary care physician, Kuznowicz complained of all the previous symptoms with no improvements and an increase in hearing problems and ear pain.  Doc. 19-6 at 1.  Dr. Schock reported that Kuznowicz's "symptoms seem to be disabling"; while Dr. Schock's reasoning is unexplained, he likely reached this conclusion because Kuznowicz was bed-ridden for a few days and had to miss important social events.  *Ibid*.  The final assessments from Dr. Schock on December 28, 2010, were vertigo, ataxia, migraine, subjective tinnitus, Ménière's disease unspecified; he continued to advise that Kuznowicz follow-up with his specialists.  *Id*. at 3.

57.     At examinations by Dr. Iqbal, the neurologist, on September 16, October 14, December 2, 2010, and February 3, 2011, Kuznowicz complained of recurrent episodes of vertigo with nausea, panic, and a feeling of fullness in his left ear with fluctuating hearing loss.  Doc. 19-5.  Kuznowicz told Dr. Iqbal that the medications that Dr. Hain had prescribed were not working, and that he had decided on his own to stop taking one of his medications.  *Id*. at 1.  As

a result, Dr. Iqbal prescribed him several other medications, including Xanax, Topomax, and Depakote, an anti-seizure medication. *Id*. at 1, 3-4. Because Kuznowicz reported that those medications did not work, Dr. Iqbal felt that a diagnosis of migraine phenomena was unlikely. *Id*. at 8.

58. On December 9, 2010, Kuznowicz was re-examined by Dr. Hain, the dizziness and balance specialist. Doc. 19-4. Dr. Hain reaffirmed his earlier diagnosis that Kuznowicz suffered from migraine associated vertigo and increased his migraine medications. *Id*. at 2.

59. On March 16, 2011, Kuznowicz was examined by Dr. Jeffrey Royce at the Swedish American Hospital. Doc. 19-8. Kuznowicz complained of worsening vertigo and headaches in his right temple and between the eyes, occurring three to five times a week and typically lasting one to two hours. *Id*. at 1. Kuznowicz also complained of nausea, vomiting, photophobia, sonophobia, tinnitus, ataxia, vertigo swimming vision, sweats, bilateral finger numbness, and hearing loss lasting twenty minutes. *Ibid*. Dr. Royce assessed that Kuznowicz had basilar migraine, anxiety, and insomnia. *Id*. at 2. Dr. Royce's plan was "prophylactic therapy with prophylaxis with antidepressant therapy, prophylaxis with calcium channel blockers," and he prescribed other medications due to "frequency of pain." *Ibid*.

**H.      Kuznowicz's Social Security Benefits Claim**

60. In addition to seeking STD and LTD benefits under the Plan, Kuznowicz applied for disability benefits from the Social Security Administration. The Social Security Administration decided on August 2, 2010, that Kuznowicz met the qualifications for disability under the Social Security Act. Doc. 21-4 at 47. Kuznowicz was awarded back and future payments of $1,921 per month retroactive to May 2010. *Ibid*.

61. On July 22, 2010, Dr. George Andrews reviewed Kuznowicz's medical records for the Social Security Administration, relying on the results of Dr. Jones's audiological studies from December 16, 2009, and June 29, 2010; Dr. Iqbal's neurological consultation on February 19, 2010; Kuznowicz's appointments with Dr. Schock on May 3 and July 13, 2010; and Kuznowicz's May 26, 2010 visit with Dr. Sheykholeslami. Doc. 21-2 at 22. Dr. Andrews found that, "[b]ased on medical evidence, although the documented hearing loss is not severe to meet the listing, the claimant equals the intent of listing 2.07AB due to balance loss, tinnitus, vestibular dysfunction and hearing loss." *Ibid*. The Social Security Administration adopted Dr. Andrews's recommendation. *Id*. at 23.

62. Listing 2.07 corresponds to "Disturbance of labyrinthine-vestibular function (including Ménière's disease) characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B: A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and B. Hearing loss established by audiometry." 20 C.F.R. Part 404, Subpart P, App. 1. "These disturbances of balance are characterized by an hallucination of motion or loss of position sense and a sensation of dizziness which may be constant or may occur in paroxysmal attacks. Nausea, vomiting, ataxia, and incapacitation are frequently observed, particularly during the acute attack. It is important to differentiate the report of rotary vertigo from that of 'dizziness' which is described as lightheadedness, unsteadiness, confusion, or syncope." *Ibid*.

**Conclusions of Law**

Kuznowicz's claim for benefits arises under ERISA, 29 U.S.C. § 1001 *et seq*. He seeks to "recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B).

## I.    Exhaustion

Defendants' answer asserts as an affirmative defense that Kuznowicz "has not …

exhausted administrative remedies available to claim [long-term disability] benefits."  Doc. 5 at

3.  However, Defendants failed to press their exhaustion defense in any detail in their proposed

findings of fact and conclusions of law.  Doc. 21 at 30-31.  The defense therefore is forfeited.

*See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011);  *Fabriko Acquisition Corp. v.*

*Prokos*, 536 F.3d 605, 609 (7th Cir. 2008); *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924,

926 (7th Cir. 2007); *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004);

*Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1995); *United States v.*

*Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

## II.    Whether Prudential Is A Proper Defendant

Defendants contend that Prudential is not a proper defendant because only the Plan as an

entity can be sued under ERISA.  Doc. 21 at 18-21.  Section 1132(d)(1) states: "An employee

benefit plan may sue or be sued under this subchapter as an entity."  29 U.S.C. § 1132(d)(1).

Section 1132(d)(2) states: "Any money judgment under this subchapter against an employee

benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable

against any other person unless liability against such person is established in his individual

capacity under this subchapter."  29 U.S.C. § 1132(d)(2).  The Seventh Circuit has interpreted

§ 1132(d) as follows: "The first clause [§ 1132(d)(1)] just allows plans to sue or be sued, and the

second clause [§ 1132(d)(2)] just specifies consequences *if* the plan is sued; neither seems to be

limiting the class of defendants who may be sued.  The benefits are an obligation of the plan, so

the plan is the logical and normally the only proper defendant.  But in cases such as this, in

which the plan has never been unambiguously identified as a distinct entity, we have permitted

the plaintiff to name as defendant whatever entity or entities, individual or corporate, control the plan." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 879 (7th Cir. 2008); *see also Larson v. United Healthcare Ins. Co.*, __ F.3d __, 2013 WL 3836236, at *7-8 (7th Cir. July 26, 2013) (same).

That situation is present here. The benefit highlights in the Certificate of Coverage list the group contract holder (Wrigley) and the group contract number (DG-73636-IL), but no distinct plan administrator. Doc. 21-11 at 5-8. Prudential's address is listed on the first page of the Certificate of Coverage. *Id*. at 10. In a section entitled "Assistance with Your Questions" in the ERISA statement attached to the Certificate, claimants are directed to contact their "plan administrator." *Id*. at 55. Claimants are also told that the people who operate the Plan are their "fiduciaries," but no plan administrator or fiduciary is identified. *Ibid*. The only contact information provided is for Prudential Insurance Company of America and the U.S. Department of Labor. Doc. 21-11 at 10, 52, 55. Although it is unclear from the Plan documents who the administrator is if not Prudential, it is clear that Prudential made the decisions regarding Kuznowicz's claims and is responsible for paying benefits under the Plan. Prudential thus controls the Plan and is a proper party. *See Larson*, 2013 WL 3836236, at *9 ("where the plaintiff alleges that she is a participant or beneficiary under an insurance-based ERISA plan and the insurance company decides all eligibility questions and owes the benefits, the insurer is a proper defendant in a suit for benefits due under § 1132(a)(1)(B)"); *Madaffari v. Metrocall Cos. Grp.*, 2004 WL 1557966, at *5 (N.D. Ill. July 6, 2004) (where the plan had similar ambiguities, holding that "because the intent of ERISA is that the 'party legally responsible for paying benefits governed by ERISA is a party that can be sued,' the Court is unable to say that ReliaStar [Life Insurance Company] is not a proper defendant in this action").

The principal authority cited by Defendants, *Mote v. Aetna Life Insurance Co.*, 502 F.3d 601, 611 (7th Cir. 2007), is inapposite. The Seventh Circuit recently clarified that *Mote* does not categorically prohibit § 1132(a)(1)(B) suits against insurance companies. *See Larson*, 2013 WL 3836236, at *8. Rather, *Mote* simply affirmed the dismissal of claims against the plan insurer/administrator where "the lines between the employer, the plan, and the insurer/administrator were not fuzzy." *Ibid.* (citing *Mote*, 502 F.3d at 611). Here, by contrast, those lines are unclear, making Prudential an appropriate defendant.

## III.    The Merits

Section 1132(a)(1)(B) empowers courts to review a plan administrator's decision to deny benefits. The court must determine: (1) whether Kuznowicz was entitled to STD benefits for the period between March 2, 2010, and December 15, 2010; and (2) whether he was entitled to LTD benefits after December 15, 2010. Because Kuznowicz "seeks to enforce benefits under the policy[,] he … bears the burden of proving his entitlement to contract benefits." *Ruttenberg v. U.S. Life Ins. Co. in City of N.Y.*, 413 F.3d 652, 663 (7th Cir. 2005).

The parties agree that the standard of review in this case is *de novo*. The "ultimate question" here is whether Kuznowicz "was entitled to the benefits he sought under the plan." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007). The court "must come to an independent decision on both the legal and factual issues that form the basis of the claim. What happened before the Plan administrator is irrelevant." *Ibid.*; *see also Marantz v. Permanente Med. Grp., Inc. Long Term Disability Plan*, 687 F.3d 320, 328 (7th Cir. 2012). The court must "interpret the terms of the policy in an ordinary and popular sense as would a person of average intelligence and experience." *Ross v. Ind. State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1011 (7th Cir. 1998) (internal quotation marks omitted). Furthermore, "in its *de novo*

review[,] the district court may … permit the introduction of additional evidence [not before the plan administrator] necessary to enable it to make an informed and independent judgment." *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994).

## A. The Termination of STD Benefits

Defendants argue that Kuznowicz was not entitled to STD benefits after March 1, 2012, because the records did not support a finding of a disability that prevented him from returning to work. Doc. 21 at 22. The Plan states in relevant part: "[Prudential] will stop sending you payments and your claim will end on the earliest of the following: … 3. The date you are no longer disabled under the terms of the plan. 4. The date you fail to submit proof of continuing disability satisfactory to Prudential." Doc. 21-11 at 22. Thus, to prevail on his claim for STD benefits, Kuznowicz must show that when his STD benefits were terminated, he suffered from a disability, which the Plan defines as (1) a "sickness," meaning "any disorder of your body or mind, but not an injury," that (2) rendered him "unable to perform the material and substantial duties of [his] regular occupation," meaning duties that "are normally required for the performance of [his] regular occupation and cannot be reasonably omitted or modified." *Id*. at 16. Kuznowicz has not met his burden of showing that he suffered from a sickness; even if the court is wrong on that point, Kuznowicz has not shown that his ailments rendered him unable to perform the material and substantial duties of his regular occupation.

### 1. Whether Kuznowicz Suffered from a "Sickness" Within the Meaning of the Plan

There are some conditions, including "[s]ubjectively painful" ones, whose diagnosis rely almost exclusively on self-reporting. *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 769 (7th Cir. 2010). The Seventh Circuit has held that a plaintiff need not "prove her condition with objective data where no definitive objective test exists for the condition or its severity." *Ibid*.

Examples of such conditions include fibromyalgia and complex regional pain syndrome, *see id*. at 768-69, and chronic fatigue syndrome, *see Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007).

A vestibular disorder, by contrast, can be verified by objective testing. Social Security regulations require that "disturbed" vestibular function be "demonstrated by caloric or other vestibular tests" and that "[h]earing loss [be] established by audiometry" to meet the disability listing for a vestibular disorder. 20 C.F.R. Part 404, Subpart P, App. 1. The regulations explain: "The diagnosis of a vestibular disorder requires a comprehensive neuro-otolaryngologic examination with a detailed description of the vertiginous episodes, including notation of frequency, severity, and duration of the attacks. Pure tone and speech audiometry with the appropriate special examinations, such as Bekesy audiometry, are necessary. Vestibular function is assessed by positional and caloric testing, preferably by [ENG]." *Ibid*. The Vestibular Disorders Association likewise advises that a "thorough evaluation of the inner ear may … require several different kinds of tests." *Diagnosis: How Are Vestibular Disorders Diagnosed?*, Vestibular Disorders Ass'n, *available at* http://vestibular.org/understanding-vestibular-disorder/diagnosis (last visited July 31, 2013). Such tests include vestibulo-ocular reflex, which measures eye movements; ENG, which measures involuntary eye movements; VEMP testing to evaluate whether the "saccule and the inferior vestibular nerve are intact and functioning normally"; CDP to test postural stability; audiometry; and scans, such as MRIs or computerized tomography ("CT") scans, to see if any structures in or around the inner ear show problems. *Ibid*. Given the considered views of the Social Security Administration and the Vestibular Disorders Association, Kuznowicz's alleged vestibular disorder can and must be established with objective medical evidence for purposes of his ERISA claim. *Cf. Myers v.*

*Astrue*, 2009 WL 1748220, at *12 (S.D. Ind. June 18, 2009) ("Because the objective medical evidence reveals that Plaintiff has battled chronic vertigo to the extent that she required surgery to place tubes in her ears, the opinions of Dr. Walters are supported by the objective medical evidence, and they should have been given controlling weight.").

Kuznowicz underwent numerous tests, with largely unremarkable results. An MRI and EcoG showed normal brain function. FOF ¶ 49. Dr. Jones found mild hearing loss in both ears, FOF ¶¶ 35, 39, and Dr. Andrews concluded that the hearing loss did not rise to the level one would expect to see for a diagnosis of a vestibular disorder, FOF ¶ 61. Dr. Hain, a specialist in dizziness and balance disorders, found Dr. Jones's audiology tests to be inconsistent and mistakenly recorded, and he could not repeat the findings of hearing loss on re-examination. FOF ¶ 50. Dr. Jones found "a pathological result" in her December 2009 VEMP test. FOF ¶ 35. But Dr. Hain questioned the reliability of this test and conducted his own test, which yielded normal results. FOF ¶ 50. Dr. Sheykholeslami's vestibular exam also produced normal results. FOF ¶ 38. OSF Rehabilitation Service conducted the only CDP test, which found that Kuznowicz's composite scores were within normal limits. FOF ¶ 42. Dr. Hain confirmed a diagnosis of "nystagmus," or involuntary eye movement. FOF ¶ 52. But an ENG, also designed to test involuntary eye movement, produced normal results. FOF ¶ 50.

The specialists largely could not find the cause or causes of Kuznowicz's claimed symptoms. Dr. Hain concluded that the Ménière's disease was dubious. FOF ¶¶ 48, 52. Due to the inconsistent results from audiology tests, Dr. Jones believed that "some amount of non-organic [meaning of an unknown cause] hearing loss versus possible psychological hearing loss [was] suspected." FOF ¶ 55. She also suggested that, "at minimum[, Kuznowicz's symptoms were] being exacerbated by his anxiety, if not being a major contributing factor." FOF ¶ 35. Dr.

Sheykholeslami opined that Kuznowicz was suffering from a "psychosomatic more than a structural" disorder. FOF ¶ 37. He further commented that he suspected that Kuznowicz was bringing his problems upon himself. FOF ¶ 29. Given the opinions of these specialists, and the largely unremarkable test results, Kuznowicz has failed to demonstrate that he suffered from a vestibular disorder.

It is true that Dr. Andrews recommended that Kuznowicz's Social Security disability claim be granted. In so doing, however, Dr. Andrews found that Kuznowicz satisfied not the actual listing for a vestibular disorder, but only the listing's "intent." FOF ¶ 61. While a Social Security Administration finding of disability can be evidence that a claimant is disabled, it is not entitled to dispositive weight and is not binding on employers under ERISA. *See Holmstrom*, 615 F.3d at 773 (holding that a plan "is not forever bound by a Social Security determination of disability"); *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009) (noting that the Seventh Circuit has "repeatedly emphasized that the SSA's determination of disability is not binding on employers under ERISA"). Dr. Andrews's recommendation is entitled to even less weight given his determination that Kuznowicz did not actually meet the listing for a vestibular disorder.

Some of Kuznowicz's physicians suggested a psychological cause of Kuznowicz's claimed ailments. However, both of Kuznowicz's psychiatrists concluded that he did not suffer from PTSD. FOF ¶¶ 44-45. And Dr. Wight found "the manifestations of vestibular issues are not closely related to acute changes in his mood nor is there any tight relationship to any acute anxiety/panic exacerbation." FOF ¶ 44. In any event, Kuznowicz denies that "the underlying causation" of his alleged impairments is "mental illness." Doc. 22 at 28.

In sum, given the objective medical evidence, the court concludes that Kuznowicz has failed to meet his burden of proving that he suffered a "sickness" within the meaning of the Plan. *See Tamizkar v. Am. United Life Ins. Co.*, 2010 WL 3973997, at *16-17 (D. Kan. Sept. 30, 2010) (holding under the *de novo* standard that the plaintiff did not meet his burden because "[m]uch of the medical record [refers] to continuing complaints that lack confirmation by objective findings and that indeed may be the result of psychological factors, rather than an injury or sickness"); *Keith v. Fed. Exp. Corp. Long Term Disability Plan*, 2010 WL 1524373, at *1-2, 5-6 (W.D. Va. Apr. 15, 2010) (holding under the abuse of discretion standard that the denial of benefits was proper where the plaintiff's complaints of vertigo and imbalance were not confirmed by vestibular testing); *Feigenbaum v. Merrill Lynch & Co., Inc. Basic Long Term Disability Plan*, 2007 WL 2248096, at *5-6 (D.N.J. Aug. 2, 2007) (holding under the abuse of discretion standard that the denial of benefits was proper based on the lack of "documentation which would clearly substantiate an organic cause for [the plaintiff's] dizziness and abnormal eye motion," where the plaintiff's vertigo was largely self-reported and the results of medical testing were "largely unremarkable") (internal quotation marks omitted).

Although the analysis could stop here given the objective medical evidence of record, the court adds for good measure that Kuznowicz's self-reporting of his various symptoms and ailments is highly suspect. As noted above, Kuznowicz contends in this court that his November 2009 car accident was caused by his "symptoms associated with vertigo, ear aches, severe migraine headaches, chronic imbalance, and persistent episodes of lightheadedness, as well as hearing and vision limitations; in addition to the side effects of his prescribed medications." Doc. 19 at 4. That contention is incredible. Kuznowicz pleaded guilty to driving under the influence of alcohol for the accident; the accident was caused by drunk driving resulting from

Kuznowicz's excessive drinking that day, not his alleged ailments. FOF ¶ 12. The fact that Kuznowicz would falsely blame his alleged symptoms for the accident undermines the credibility of his claim, and the self-reporting to his physicians, to have suffered from those symptoms in the first place.

      **2.     Whether Kuznowicz's Ailments Prevented Him From Performing the "Material and Substantial" Duties of His Occupation**

Even if Kuznowicz showed that he suffered from a "sickness" within the meaning of the Plan, he would be entitled to STD benefits only if he also showed that the sickness prevented him from performing the "material and substantial duties" of his occupation. Doc. 21-11 at 16; *see Holmstrom*, 615 F.3d at 770 ("A distinction exists however, between the amount of fatigue or pain an individual experiences, which … is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured.") (citation and internal quotation marks omitted); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) ("It is not enough to show that [the claimant] had received a diagnosis of fibromyalgia … since fibromyalgia is not always (indeed, not usually) disabling."). Kuznowicz submits that the "material and substantial duties"—those normally required of his employment at Wrigley—include the following: "major conversation (interaction with store personnel and the general public), major far vision, near vision, and depth (driving a vehicle, reading, setting up displays, paperwork, and displays), and significant standing and walking. (W.M. Wrigley Jr. Co. Physical Demand Analysis)." Doc. 19 at 15. Kuznowicz adds that his position was "comparable to that of the DOT's Sales Manager …, which requires Plaintiff to deal with people[;] influence people in their opinions, attitudes, and judgments[;] and frequently talk and hear." *Ibid*.

The court does not quarrel with this description of his duties, but the evidence does not support Kuznowicz's assertion that he could not perform those duties. Only Dr. Schock,

Kuznowicz's personal physician, opined that Kuznowicz should not work because his conditions were disabling. FOF ¶¶ 25, 27, 56. Kuznowicz's other physicians, all specialists, concluded that his claimed symptoms could be alleviated with treatment. Dr. Hain, the balance and dizziness specialist, felt that Kuznowicz's condition could be treated medically, FOF ¶ 52, as did Dr. Wight, the psychiatrist; FOF ¶ 44. Dr. Sheykholeslami, the ENT, suggested psychotherapy, balance rehabilitation, and medicinal treatment. FOF ¶ 36. Dr. Ingrassia, the sleep specialist, suggested cognitive behavioral therapy for Kuznowicz's balance problems, and counseled him to quit smoking and drinking alcohol. FOF ¶¶ 40-41. Dr. Iqbal, the neurologist, noted that Kuznowicz's anxiety was well-controlled by medication. FOF ¶ 47. None of these specialists mentioned or recommended work restrictions. This is compelling evidence that Kuznowicz's claimed ailments would not have prevented him from performing his job duties. *Cf. Black v. Long Term Disability Ins.*, 2007 WL 2821997, at *7 (E.D. Wis. Sept. 27, 2007) (arbitrary and capricious standard) ("Additionally, Standard [the plan insurer] itself reviewed plaintiff's physicians' records and emphasized the discrepancies between the clinical records and the letters written after plaintiff filed for disability benefits. For example, none of plaintiff's physicians ever recommended work restrictions outside of the initial six-week post-operative recovery period until after plaintiff filed for disability; at most, they suggested that plaintiff should not be subjected to verbal abuse and harassment. Moreover, the medical records between the date of surgery and the claimed date of disability did not indicate a worsening of plaintiff's condition that would justify the abrupt change in the physicians' opinions pre-and post-claim. Plaintiff's aneurysm remained stable in size, and her blood pressure, while variable, measured at normal levels during the year before she filed her claim. Thus, these discrepancies, when combined with the nearly identical conclusions drawn by five different consulting physicians, including

three independent specialists, led Standard to conclude that plaintiff was not disabled. … Thus, Standard's ultimate decision to deny benefits is reasonably supported by the medical evidence in the record."), *aff'd*, 582 F.3d 738 (7th Cir. 2009); *Ramirez v. Apfel*, 2000 WL 336552, at *6 (N.D. Ill. Mar. 28, 2000) ("There are five different medical opinions, including one of a state agency physician, which recommended no work restrictions, and only one opinion of another state agency physician who in any event arguably placed no more than a slight restriction on Plaintiff's work activities.  As we have already suggested, this case does not present a close call, and the ALJ was right to discontinue the evaluation process.").

Dr. Schock's contrary opinion holds far less weight than those of the specialists.  The Seventh Circuit has long recognized that the opinions of personal physicians regarding their patients' alleged disabilities are often biased in the patient's favor, making those opinions less trustworthy.  *See Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) ("the treating source may not be an expert on the claimant's condition and, at worst, may bend over backwards to assist a patient in obtaining benefits") (internal quotation marks omitted); *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) (noting that it "is well known" that "many physicians … will often bend over backwards to assist a patient in obtaining benefits"); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").  Moreover, Dr. Schock is not a specialist and performed none of the relevant tests.  *See Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866, 876 (7th Cir. 2006) ("The only physician who opined that Mr. Sperandeo could not return to work based on his neurological condition was Dr. Lewis.  However, Dr. Lewis was an internist.  By contrast, the various physicians who did not place restrictions on Mr. Sperandeo's return to work were specialists in the field of neurology: neurologists, an

otoneurologist and a neuropsychologist. Therefore, given the opinions of the various specialists who examined Mr. Sperandeo, CNA's decision to deny benefits on the ground of neurological impairment was correct.").

Finally, Dr. Schock provided little to no explanation as to how Kuznowicz would be functionally limited in the workplace. On March 1, 2010, Dr. Schock stated that he thought it was unsafe for Kuznowicz to drive, to set up displays, or to make presentations for two months, and that his PTSD (a diagnosis that the psychiatrists later rejected) and vertigo were disabling; but Dr. Schock did not explain how Kuznowicz's condition limited his ability to safely perform those duties. Doc. 21-5 at 6, 147. On October 6, 2010, Dr. Schock stated that Kuznowicz's conditions were disabling because he was bed-ridden for a few days, missing important social events; but again, Dr. Schock did not explain how being bed-ridden for a few days, on one occasion, rendered Kuznowicz unable to return to work. Doc. 19-6 at 1. For these reasons, Dr. Schock's recommendation that Kuznowicz not return to work after March 1, 2010, is insufficient to show that Kuznowicz could not perform the "material and substantial" duties of his occupation.

It is true that a claimant's "repeated attempts to seek treatment for his condition [can] support[] an inference that his [complaints] … were disabling." *Diaz*, 499 F.3d at 646. In *Holmstrom*, for example, the Seventh Circuit held that the "claimant's pursuit of extensive treatment including heavy medication and repeated surgical procedures supports an inference that his pain, though hard to explain by reference to physical symptoms, was disabling." 615 F.3d at 769 (internal quotation marks omitted). Such an inference is unwarranted here. Although Kuznowicz had seen numerous doctors, he had not undergone inconveniencing or painful procedures, such as surgery, that would raise an inference of disability based on his

diligent pursuit of treatment. *Compare Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir.

2004) ("What is significant is the improbability that [the claimant] would have undergone the

pain-treatment procedures that she did, which included not only heavy doses of strong drugs

such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her

spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of

her complaints of pain and so increase her chances of obtaining disability benefits.").

In sum, Kuznowicz has not shown that his ailments prevented him from performing the

duties "normally required for the performance of [his] regular occupation." Doc. 21-11 at 16.

Applying *de novo* review, it follows that the denial of STD benefits from March 2, 2010, through

December 15, 2010, was proper.

### B.     Entitlement to LTD Benefits

Kuznowicz's eligibility for LTD benefits began on December 15, 2010, twelve months

after he began receiving STD benefits. The definition of "disability" for purposes of obtaining

LTD benefits is in all relevant respects the same as the definition of "disability" for the purposes

of obtaining STD benefits. Doc. 21-11 at 16, 28. Because Kuznowicz has not shown that he

was disabled for purposes of receiving STD benefits, and because nothing in his medical record

after December 15, 2010, undermines that judgment, his LTD claim fails as well. This is

particularly true for the period after December 15, 2011, when the policy converted to "a

'general' disability provision [which] provides benefits if the claimant is unable to perform *any*

*job* for which he is qualified by reason of education, training or experience." *Hammond v. Fid.*

*& Guar. Life Ins. Co.*, 965 F.2d 428, 430-31 (7th Cir. 1992) (emphasis added); *see* Doc. 21-11 at

28, 36.

**Conclusion**

For the foregoing reasons, Kuznowicz has not shown by a preponderance of the evidence that he was entitled to STD benefits from March 2, 2010, through December 15, 2010, or to LTD benefits thereafter. Accordingly, judgment will be entered against Kuznowicz and in favor of Defendants.

August 12, 2013

_____
United States District Judge